WENDELL C. HARP *v.* GARY E. KING ET AL.
(SC 16759)

Sullivan, C. J., and Borden, Katz, Palmer and Pellegrino, Js.

Argued October 25, 2002—officially released December 9, 2003

*Charles D. Ray,* with whom were *Ingrid L. Moll, John R. Williams* and, on the brief, *Vanessa D. Roberts,* for the appellant (plaintiff).

*Nicole Fournier*, with whom, on the brief, was *Hugh F. Keefe*, for the appellees (named defendant et al.).

*David M. Sheridan*, with whom, on the brief, was *John F. Droney, Jr.*, for the appellee (defendant Vincent J. Flynn).

*Linda L. Yoder*, with whom, on the brief, was *Sheila A. Huddleston*, for the appellee (defendant Regina Rentz).

*Opinion*

PALMER, J. The plaintiff, Wendell C. Harp, an African-American real estate developer and architect who owns and manages seven low and moderate income housing developments[1] financed by the Connecticut Housing Finance Authority (CHFA),[2] appeals[3] from the judgment of the trial court rendered in favor of the defendants, Gary E. King, Vincent J. Flynn, Lawrence C. Pilcher and Regina Rentz, who are all employees of CHFA. The plaintiff initiated this action against the defendants alleging, inter alia, that, during the course of the defendants' employment with CHFA, they jointly agreed: (1) to defame him; (2) to place him in a false light in violation of his right to privacy; (3) to interfere

[1] In fact, these developments are owned by several different limited partnerships of which the plaintiff is the general partner. For purposes of this case, however, the parties have treated the plaintiff as the owner of the developments. For that reason, and for the sake of convenience, we refer to the plaintiff as the owner of the developments.

[2] CHFA is "a body politic and corporate, a public instrumentality and political subdivision of the state. Its statutory purposes include improvement of housing for low and moderate income persons . . . ." *Savings & Loan League of Connecticut, Inc.* v. *Connecticut Housing Finance Authority*, 184 Conn. 311, 312, 439 A.2d 978 (1981); see also General Statutes § 8-244. Among the purposes and powers of the CHFA is to finance the development of low and moderate income housing by loaning money to developers of such housing. See generally General Statutes § 8-250.

[3] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

tortiously with his business expectancies; and (4) intentionally to cause him emotional distress.[4] The trial court, *Devlin, J.*, granted the defendants' motions for summary judgment, concluding, inter alia, that the plaintiff was barred, under the intracorporate conspiracy doctrine,[5] from maintaining his claims against the defendants.[6]

On appeal, the plaintiff maintains that the trial court improperly granted the defendants' motions for summary judgment. In support of his claim, the plaintiff contends that: (1) the trial court improperly concluded that two internal CHFA memoranda are protected by the attorney-client privilege even though those documents inadvertently were disclosed to the plaintiff; (2) the trial court improperly determined that the plaintiff's claims were barred by the intracorporate conspiracy doctrine even though the plaintiff has not alleged a conspiracy; and (3) even if the intracorporate conspiracy doctrine prohibits him from maintaining his other claims, it does not apply to his claim of tortious interference with business expectancies. We conclude that the trial court properly granted the defendants' motions for summary judgment and, accordingly, affirm the judgment of the trial court.

The record reveals the following pertinent facts. The plaintiff owns seven low and moderate income housing developments (developments), six of which are located

---

[4] Although the defendants' allegedly tortious conduct occurred during their employment with CHFA, the plaintiff has sued them in their individual capacities.

[5] As we discuss more fully in part II of this opinion, under the intracorporate conspiracy doctrine, employees of the same corporate entity cannot conspire with one another or with the corporate entity as long as their alleged acts are within the scope of their employment.

[6] The plaintiff also alleged racial discrimination in credit practices in violation of General Statutes § 46a-66, and racial discrimination in the provision of services by a state agency in violation of General Statutes § 46a-71. Those claims, however, are not the subject of this appeal.

in New Haven and one of which is located in Ansonia. The developments are managed by Renaissance Management Company (Renaissance), an entity wholly owned by the plaintiff.[7] From 1980 to 1991, CHFA loaned the plaintiff a total of approximately ten million dollars for the construction of those developments. At all times relevant to this appeal, King was the president and executive director of CHFA. Flynn and Pilcher each served as assistant counsel to CHFA and Regina Rentz was an internal auditor for CHFA.

Beginning in or around 1991, the developments began to encounter some financial instability. By 1994, several of the developments did not generate enough income to meet expenses. The plaintiff addressed the shortfall by loaning the developments in excess of one million dollars. Nonetheless, all mortgage payments were made to CHFA in a timely manner.

Although it is not disputed that the developments were in financial distress, the parties disagree as to the cause of the problem. The plaintiff claims that the financial difficulties stemmed from circumstances beyond his control. The primary reasons that the plaintiff offered for those problems include the following: (1) the developments are not located in one discrete area but, rather, comprise thirty-two buildings scattered throughout New Haven and Ansonia,[8] thereby making them particularly expensive to operate and maintain; (2) the operating budgets of the developments were inadequate because of a high fixed debt-to-income ratio; and (3) the interest rates on the loans on the plaintiff's developments were appreciably higher than the rates paid by other developers of similar housing financed

[7] We note that, during the pendency of the proceedings in the trial court, the defendants treated Renaissance and the plaintiff as one and the same entity.

[8] This type of development sometimes is referred to as "scattered site" housing.

by CHFA.[9] By contrast, CHFA and the defendants contended that the relatively poor financial condition of the developments was due in large part to mismanagement by the plaintiff and Renaissance.

In January, 1995, the plaintiff requested that CHFA agree to restructure the financing of four of the seven developments. Specifically, he asked CHFA for a reduction in the interest rate on the loans on those developments or, alternatively, for an extended term within which to satisfy the loans, thereby reducing his monthly debt service obligation. Although CHFA had the discretion to restructure loans, CHFA also maintained a policy against any such restructuring if, in its opinion, the need for restructuring was due to mismanagement of the development.

CHFA performed financial audits and management reviews of all seven developments in connection with the plaintiff's request to restructure the loans. In particular, Rentz performed a detailed audit and review of the developments for fiscal year 1994 and for the first six months of 1995.[10] Upon conclusion of her evaluation of the developments, Rentz submitted two reports to King, dated June 5, 1995, and August 4, 1995, in which she expressed concern about the accounting methods used to document certain expenses. Rentz also questioned whether the plaintiff was overcharging the developments for goods and services.

Joseph L. Marsan, CHFA's asset manager, also expressed concerns regarding the management of the developments in a July 6, 1995 memorandum to Bruce H. Perry, CHFA's vice president of asset management

[9] The plaintiff asserts that the interest rate charged by CHFA on loans to developers of similar low and moderate income housing developments was 7 percent whereas the interest rate on some of the loans on the plaintiff's developments was approximately 10 percent.

[10] Prior to those dates, CHFA never had performed a similarly intensive review of the financial condition and management of the developments.

and loan servicing.[11] In that memorandum, Marsan characterized the management of the developments as "ineffective," and described Renaissance as "financially unstable . . . ." Marsan also observed that the developments were being subject to "systematic and deliberate overcharging" for services rendered by other entities controlled by the plaintiff. In addition, Marsan concluded that the physical condition of the developments was "deteriorating at an alarming rate . . . ." Finally, Marsan recommended that Renaissance be terminated immediately as the managing agent for two of the developments.

Neither Rentz' audit reports nor Marsan's memorandum was disclosed to the plaintiff. In fact, in her August 4, 1995 report to King, Rentz wrote that "none of the findings noted in this or the previous report ha[s] been discussed with [the plaintiff]. This was done so that [the plaintiff] would not have the opportunity to take actions harmful to CHFA's interests prior to a . . . decision on a plan of action [by the board of directors]." The report goes on to state, however, that the plaintiff should be afforded an opportunity to respond to the findings, but "only after [CHFA] consult[s] with counsel."

The plaintiff disputes the fairness and accuracy of Rentz' audit reports and Marsan's memorandum. He notes, for example, that: (1) a memorandum written by Rentz to King indicates that her audit of the developments uncovered no financial improprieties, and only one invoice of $58 could not be verified; (2) in February, 1995, King approved the plaintiff's request for a loan from certain escrow funds after concluding that "[t]he annual budget and operating expenses of the [plaintiff's]

---

[11] This memorandum apparently was written in response to the plaintiff's request that he be permitted to withdraw cash from his escrow account to pay delinquent utility bills and certain payroll taxes.

development[s] [were] adequately accounted for," and, further, that "[t]he physical condition of the [developments] [was] satisfactory"; (3) an accounting firm conducted an independent audit of the developments and concluded that the "amounts charged to [each of the developments from 1995 through 1998] were reasonable";[12] (4) the accounting firm also reported no "material findings" as to either the internal controls utilized by the plaintiff or his compliance with the programs and guidelines of the federal Department of Housing and Urban Development (HUD); (5) two former CHFA employees, including King's predecessor, Orest T. Dubno, stated that the developments were in "good" or "relatively good" condition during their tenure at CHFA; (6) the developments had received no citations or notices of building code violations; and (7) previous inspections by CHFA personnel working under the supervision of independent property evaluators hired by CHFA contradict Marsan's opinion that the developments were in poor physical condition.

In response to the plaintiff's refinancing request, CHFA contracted with an independent property management consultant, Rockwell Management Group, Inc. (Rockwell), to assist in reviewing the management procedures and systems employed by Renaissance. On August 16, 1995, Rockwell submitted a preliminary report to CHFA in which it highlighted certain deficiencies in those areas.

On August 29, 1995, the board of directors of CHFA passed a resolution, in response to the plaintiff's request for loan restructuring, directing CHFA personnel to draft and implement a "supplemental management

---

[12] We note, however, that with respect to the four developments for which the plaintiff had requested a restructuring of his loan agreement, the report indicated that the financial stability of those developments depended upon the plaintiff's ability to secure a reduced interest rate on his CHFA loans or, alternatively, his continued infusion of capital into the developments.

agreement" concerning the plaintiff's developments within thirty days. The resolution also directed CHFA's asset management staff to set performance standards for the developments. Finally, the resolution further required that Renaissance correct the maintenance deficiencies in the developments within seven months.

On September 30, 1995, Rockwell submitted its final report regarding the management of the developments. The report recommended certain changes to enable Renaissance to function more efficiently. Although some of the conclusions in the report were positive,[13] the overall conclusion was that, "if present management practices are continued, further financial/cash flow and maintenance difficulties will be created, existing problems will be obscured and exacerbated, and the properties will continue to deteriorate physically."

In December, 1995, a dispute arose between CHFA and the plaintiff regarding the plaintiff's failure to file timely operating budgets and monthly cash flow reports for fiscal year 1996. On December 5, 1995, Marsan notified the plaintiff that those operating budgets were overdue as of December 1, 1995, and that, if they were not submitted within thirty days, CHFA could declare the developments in default. On January 19, 1996, John W. White, Jr., the senior asset manager of CHFA, informed the plaintiff by letter that, although CHFA had received the development budgets on January 16, 1996, certain required supporting documentation was missing and, therefore, the plaintiff's budget submission was incomplete. The letter warned the plaintiff that the developments were in default and that Renaissance was in jeopardy of being terminated as the managing agent of the developments. The letter also urged the plaintiff

---

[13] For example, the report noted that the property manager appeared to be qualified and well organized, and that the occupancy rates of the developments were high.

to provide the necessary documentation. The plaintiff, however, did not do so, and, on February 9, 1996, CHFA advised the plaintiff that HUD had been notified of his failure to provide the required documentation. CHFA further notified the plaintiff that this violation, along with his failure to resolve certain outstanding maintenance problems, placed the plaintiff in technical default of his agreements with CHFA.

On February 20, 1996, CHFA formally responded to the plaintiff's request for debt restructuring by providing him with a draft supplemental management agreement. The terms of the proposed agreement were based, in part, on Rockwell's evaluation of the management of the developments. The plaintiff declined to sign the agreement because, in his view, CHFA unfairly had concluded that management deficiencies, rather than the high fixed debt-to-income ratios of the developments, were the cause of the developments' financial and physical problems. The plaintiff further indicated that he was opposed to relinquishing management over the developments.

On May 10, 1996, the plaintiff met with CHFA personnel to discuss the financial relief he had requested and CHFA's concerns about the financial and physical condition of the developments. In a follow-up letter from Perry dated May 13, 1996, CHFA advised the plaintiff that, unless he signed the proposed supplemental management agreement, CHFA would recommend to the board of directors that Renaissance's management contracts not be renewed.[14] Perry's letter also outlined the steps that the plaintiff needed to take before his debt restructuring request would be presented to the board. Those steps included: (1) the temporary renewal of Renaissance's management contracts followed by a six

---

[14] CHFA's management contracts with Renaissance were due to expire at the end of May, 1996.

month period during which CHFA would monitor and evaluate Renaissance's performance; (2) lockbox agreements pursuant to which the deeds to the plaintiff's developments would be held in escrow in the event that the developments were unable to meet their financial obligations; and (3) the suspension of management fees during the six month period.

In a letter to King dated May 15, 1996, the plaintiff protested the terms set forth in Perry's letter and CHFA's treatment of his request for debt restructuring. The plaintiff also stated that, if necessary, he would seek relief in federal court. Thereafter, on May 29, 1996, the plaintiff formally advised CHFA that he was reappointing Renaissance as the managing agent for all seven developments. On June 5, 1996, the plaintiff informed King that he was withdrawing his request for refinancing. King, however, did not accept the reappointment of Renaissance as the managing agent for the developments.[15]

In June, 1996, the plaintiff sent a letter to the secretary of HUD requesting assistance in redressing what he characterized as CHFA's "extraordinary racially biased actions" against him. Following the letter and in response to a HUD request, CHFA provided HUD with a list detailing more than 300 instances, over a twelve month period, of other developers' noncompliance with various rules and regulations governing the management and maintenance of CHFA-financed properties. Although CHFA indicated that many of these violations had been or were being addressed, the plaintiff maintains that, despite the violations, CHFA never had declared those other developers to be in "technical

---

[15] We note, however, that there is no indication in the record that CHFA ever took any legal action against the plaintiff, either on the basis of the financial status of the developments or the renewal of Renaissance's management contracts.

default" of their financial obligations or threatened to terminate their management contracts.[16]

In response to concerns about the treatment he was receiving from CHFA, the plaintiff filed a request, in August, 1996, under the state Freedom of Information Act,[17] to review all documents in the possession of CHFA that related to him or his developments. Those documents were made available for review by the plaintiff at CHFA's offices.[18] During the course of his review of those documents with Renaissance's controller, Milton L. Jackson, the plaintiff came across two internal memoranda. One was labeled "litigation strategy" and the other was labeled "strategy." Both were stamped "privileged and confidential." The memoranda,[19] which were written by Flynn in June, 1996, at the direction of William A. Dickerson, CHFA's general counsel, were addressed to King, Pilcher and Rentz, among others, and discussed the written agreements between CHFA and the plaintiff concerning the plaintiff's CHFA-financed developments. According to the plaintiff, the legal strategies memoranda outline a scheme to remove Renaissance as the managing agent for the plaintiff's

---

[16] The plaintiff was not alone in his belief that he was being treated differently from other developers of CHFA-financed developments. Specifically, Lenward Gatison, a former vice president of CHFA who was employed there until 1996, believed that there was a concerted effort by some at CHFA to take the plaintiff's developments away from him, that the plaintiff was held to a higher standard than Caucasian developers and that King's actions, in particular, were motivated, in part, by the plaintiff's race. Gatison could not say, however, that any other defendant was motivated by racial considerations.

[17] General Statutes (Rev. to 1995) § 1-19, as amended, now codified at General Statutes § 1-210.

[18] The record in this case does not indicate exactly how many documents CHFA produced pursuant to the plaintiff's freedom of information request. It appears, however, that CHFA produced a large number of boxes full of documents. Indeed, it took several days for the plaintiff and others associated with him to complete their review of those documents.

[19] We hereinafter refer to these memoranda collectively as the legal strategies memoranda.

developments and, ultimately, to take those developments away from him, by falsely accusing him of financial improprieties and discrediting him publicly. Upon reading the legal strategies memoranda, the plaintiff summarized their contents in handwritten notes and, before leaving the CHFA office, requested a photocopy of each. His request was denied, however, when a CHFA staff member and Pilcher observed that the memoranda were marked privileged and confidential.

On September 12, 1996, an article entitled "Racial Harping" was published in the New Haven Advocate. The article, which was authored by Paul Bass, reviewed the history of the dispute between CHFA and the plaintiff and indicated that the plaintiff had been the subject of unfair and unprecedented treatment by CHFA. The article also noted, however, that, in CHFA's view, the plaintiff was cheating taxpayers and mismanaging his developments.[20] Additional facts will be set forth as necessary.

In September, 1996, the plaintiff brought this action alleging, inter alia, defamation, invasion of privacy, tortious interference with business expectancies and intentional infliction of emotional distress. The plaintiff's claims are predicated on his contention that the defendants engaged in a plan to discredit him so that CHFA could declare his developments in default and ultimately force him to relinquish both his ownership and management of the developments. The plaintiff also alleged that the defendants had caused him to be subjected to reviews and audits that were "malicious and [racially] discriminatory . . . ." In addition, the plaintiff maintained that, as part of their plan, the defendants

---

[20] Bass had obtained the information for the article pursuant to a freedom of information request for certain documents in CHFA's possession. Bass later learned from a confidential source that the board of directors of CHFA had met to discuss the plaintiff and his developments and, further, that the plaintiff's developments had been audited.

had caused Bass to submit a freedom of information request to CHFA for documentation concerning the plaintiff and that CHFA made false and misleading statements to Bass about the plaintiff, which Bass included in his newspaper article.

During the course of discovery, the plaintiff sought copies of the legal strategies memoranda. The plaintiff asserted that the disclosure of the legal strategies memoranda to him in connection with his freedom of information request constituted a waiver of the attorney-client privilege with respect to those memoranda. The defendants refused to produce the legal strategies memoranda, claiming that the inadvertent disclosure of the memoranda did not constitute a waiver of the attorney-client privilege. The plaintiff then moved to compel disclosure of the memoranda. The trial court, *Moran, J.*, denied the plaintiff's motion, concluding that, under the circumstances, there had been no waiver of the attorney-client privilege.[21]

The defendants thereafter moved for summary judgment, claiming that, in the absence of the legal strategies memoranda, none of the plaintiff's claims was supported by admissible evidence. The defendants also maintained, alternatively, that the plaintiff's claims were barred by the intracorporate conspiracy doctrine. The plaintiff reasserted his claim that the disclosure of the legal strategies memoranda in connection with the plaintiff's freedom of information request constituted a waiver of the attorney-client privilege with respect to those memoranda. The plaintiff also maintained that the evidence he had adduced in opposition of the defendants' motions for summary judgment was sufficient

---

[21] Shortly thereafter, the trial court, *Devlin, J.*, in reliance on Judge Moran's ruling on the plaintiff's motion to compel, granted Flynn's motion for a protective order thereby prohibiting the plaintiff from questioning Flynn, at Flynn's deposition, about matters covered by the attorney-client privilege, including matters discussed in the legal strategies memoranda.

to defeat those motions. The plaintiff further asserted that the intracorporate conspiracy doctrine is not applicable because the plaintiff never had alleged that the defendants engaged in a conspiracy and, in any event, the doctrine does not apply because the defendants were not acting within the scope of their employment with CHFA when they engaged in their allegedly tortious conduct. The trial court, *Devlin, J.*, rejected the plaintiff's claims, granted the defendants' motions for summary judgment and rendered judgment thereon in favor of the defendants. This appeal followed.

I

The plaintiff first claims that the trial court, *Moran, J.*, improperly denied his motion to compel production of the legal strategies memoranda. In particular, the plaintiff contends that the attorney-client privilege was waived when those documents were made available for his review in connection with his freedom of information request.[22] The plaintiff further claims that, because the legal strategies memoranda contain information sufficient to defeat the defendants' motions for summary judgment, the alleged impropriety in precluding his use of those memoranda was harmful. We conclude that the trial court properly determined, under the facts of this case, that the disclosure of the legal strategies memoranda did not constitute a waiver of the attorney-client privilege. We therefore reject the plaintiff's claim.

As we previously have explained, the plaintiff alleges that the legal strategies memoranda, which Flynn had drafted and addressed to King, Pilcher and Rentz, among others, proposed a plan whereby CHFA would terminate Renaissance's management contracts and foreclose on the plaintiff's CHFA-financed develop-

---

[22] The plaintiff does not contend on appeal that the legal strategies memoranda otherwise are not protected by the attorney-client privilege. He claims, rather, that their disclosure constituted a waiver of that privilege.

ments. According to the plaintiff, Flynn indicated in the legal strategies memoranda that, to accomplish the plan, it would be necessary: (1) to "create . . . a false image of financial improprieties" by the plaintiff and Renaissance; (2) to " 'create' documentation" of their purported improprieties; and (3) to disseminate publicly the adverse information for the purpose of discrediting the plaintiff.[23]

---

[23] An affidavit that the plaintiff filed with the trial court sets forth the following detailed summary of the contents of the legal strategies memoranda:

"(a) [Flynn] had performed an analysis and overview of [Renaissance's] operations as management agent in response to a request by . . . King to remove [Renaissance] as the management company and, in his assessment, CHFA did not have sufficiently legal and winnable grounds to undertake any legitimate removal efforts.

"(b) [Flynn] gave several assessments of CHFA's legal standing in [regard] to the planned effort to terminate my management contracts and concluded that, in each instance (if existing facts were to be properly weighed by a court), it was unlikely that CHFA could win and their efforts would then subject them to potential damage claims by me. He further said that because there were no existing complaints from HUD or my tenants, my generally satisfactory management record would have to be 'redefined' as being 'problematic' through internal memo[randa] placed in my file. He stated that this would require a coordinated effort from several CHFA personnel.

"(c) The [legal strategies memoranda] stated that in order for CHFA to be successful in removing [Renaissance] it would also be necessary for CHFA staff to 'create' documentation of some form of [Renaissance's] financial improprieties, 'however necessary'. It was indicated that this creation of a false image of financial improprieties was very important since the available facts showed that all of my mortgages were current and that I had been subsidizing the properties from the beginning. It was also stated that my minority status, with its related anti-discrimination legal protections, could only be overcome if clear evidence of financial wrongdoing could be created.

"(d) [Flynn] also recommended that an appropriate rationale and paper trail of [Renaissance's] physical mismanagement of properties be created by CHFA, so that a 'technical default' could be declared. This would then lead to CHFA calling due all $10 million in loans on my properties, and thereby creating a 'financial default' to invoke seizure and foreclosure of my properties.

"(e) [Flynn] further noted that such an action of forcing foreclosure upon a project not in financial default had 'no legal basis' and had never been done before—but if everything were properly coordinated there would be no problem in forcing it through if I were caught unprepared. He emphasized that because I would be likely to contest any such efforts CHFA must develop a well-coordinated plan, move swiftly, and utilize its newly created

After the plaintiff unsuccessfully sought production of the legal strategies memoranda during discovery, he filed a motion to compel their production. The parties submitted briefs on the motion and, thereafter, the trial court, *Moran, J.*, heard argument on the plaintiff's claim that the memoranda were subject to production. The plaintiff argued, inter alia, that CHFA's failure to assert

---

trail of alleged mismanagement to overwhelm me.

"(f) [Flynn] also made mention of my racial minority (African American) developer status and noted that I was well regarded in the New Haven area—as was my attorney John Williams. Given this fact, the memorandum directed that a 'first-strike' lawsuit must be initiated against me while negotiations for the workout were still in progress, and that CHFA should file its suit in Hartford [c]ounty as opposed to New Haven [c]ounty.

"(g) [Flynn] stated that the facts showed that I had already established myself as being 'credit worthy' and [a] prominent minority developer because of the successful development of over $10 million in CHFA financed properties over nearly 15 years. Therefore, he stated, they must undertake an aggressive and deliberate plan of 'public discreditation' of me personally as a means of achieving the overall objective of getting rid of [Renaissance] and seizing my property ownership interests. This discreditation would be achieved through a series of pejorative and inflammatory articles in the local media by selectively using the false, unsubstantiated and uncorroborated negative information already placed within my CHFA files, and by then soliciting the assistance of HUD, my co-investors, and others in taking removal action against [Renaissance].

"(h) Even though the late submission of monthly financial reports had never before in the history of CHFA been asserted as the basis for a foreclosure action, the [legal strategies] memo[randa] recommended using the pretense of 'late filing' of routine monthly cash flow reports by [Renaissance] as a basis for declaring a 'technical default' and initiating a subsequent foreclosure against my ownership interests, notwithstanding the fact that no legal or administrative basis existed to support such an action. (Such actions had never been taken against any of the hundreds of CHFA nonminority developers or property managers.)

"(i) Finally . . . [the legal strategies] memo[randa] stated that even though I was one of several owners in the properties, CHFA must devise a scenario of alleged fiscal impropriety against me specifically in order that it could justify the intended action to remove me from my [m]anaging [g]eneral [p]artner status and preclude any potential for legal redress that I might have against the other intended actions. . . . Flynn noted that this removal action was without precedence or legal authority, had serious legal ramifications for CHFA if it were not successful, and required the success of the public discreditation effort to be effective."

the attorney-client privilege until after the disclosure of the memoranda to the plaintiff constituted a waiver of the privilege, even if that disclosure had been inadvertent. The defendants maintained that, under the circumstances, CHFA's inadvertent disclosure of the memoranda did not constitute a waiver of the privilege. In support of their contention, the defendants urged the court to consider that: (1) the legal strategies memoranda were disclosed only because they had been misfiled due to a clerical error; (2) the memoranda were clearly marked "privileged and confidential"; (3) the disclosure of the memoranda must be viewed in the context of the voluminous number of documents that were the subject of the plaintiff's freedom of information request; and (4) CHFA took immediate steps to prevent any further disclosure, dissemination or use of the memoranda upon learning that the memoranda mistakenly had been included among the documents provided to the plaintiff.[24]

On February 11, 1999, the trial court, *Moran, J.*, relying on *Barnes/Science Associates Ltd. Partnership* v. *Barnes Engineering Co.*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV89 02 77 64S (June 7, 1990) (1 Conn. L. Rptr. 724) (*Barnes*), denied the plaintiff's motion to compel. In so ruling, the court characterized the release of the legal strategies memoranda to the plaintiff as "a classic case of accidental, unintentional and inadvertent disclosure." Thereafter, on February 16, 2000, the trial court, *Devlin, J.*, granted

---

[24] None of the parties requested an evidentiary hearing on the plaintiff's motion to compel and the court did not conduct one. Indeed, the record indicates that the facts relevant to the motion to compel are undisputed and, further, that the parties expected the trial court to rely on the representations of counsel in regard to those relevant facts. Moreover, no party raised any claim regarding the accuracy of any of those representations. For purposes of this appeal, therefore, we, too, treat counsels' representations at oral argument on the plaintiff's motion to compel as an accurate statement of the facts bearing on the waiver issue.

Flynn's motion for a protective order and precluded the plaintiff from asking questions relating to the legal strategies memoranda at Flynn's deposition. The trial court, *Devlin, J.*, relying on the reasoning of the trial court, *Moran, J.*, in denying the plaintiff's motion to compel, concluded that the inadvertent disclosure of the memoranda by CHFA did not constitute a waiver of the attorney-client privilege. In light of those two rulings, the trial court, *Devlin, J.*, also declined to consider that portion of the plaintiff's affidavit, which was submitted in opposition to the defendants' motions for summary judgment, that purported to summarize the statements that Flynn had made in the memoranda.[25]

Our determination of the propriety of the ruling denying the plaintiff's motion to compel production of the legal strategies memoranda[26] requires us to address a question of first impression for appellate review in this state, namely, what is the appropriate standard for

[25] Because the legal strategies memoranda were deemed to be privileged, neither the memoranda nor the plaintiff's recollection of what was contained therein constituted admissible evidence for purposes of Practice Book § 17-46, which provides in relevant part: "Supporting and opposing affidavits shall be made on personal knowledge, *shall set forth such facts as would be admissible in evidence,* and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . ." (Emphasis added.) Indeed, the plaintiff does not contend that, for the purpose of determining whether the information contained in the memoranda is admissible, there is any difference between the plaintiff's recollection of the contents of the memoranda and the memoranda themselves. But cf. Conn. Code Evid. § 10-1 ("[t]o prove the content of a writing . . . the original writing . . . must be admitted in evidence, except as otherwise provided by the Code, the General Statutes or the Practice Book").

[26] In view of the fact that the trial court, *Moran, J.*, held a hearing on the plaintiff's motion to compel production of the legal strategies memoranda, and because the ruling of the trial court, *Devlin, J.*, on Flynn's motion for a protective order hinges on the reasoning for the ruling denying the plaintiff's motion to compel, we focus our attention on the ruling on the motion to compel. Our conclusion that the trial court properly denied that motion, however, is equally applicable to the ruling of the court, *Devlin, J.*, on the same underlying issue, namely, whether CHFA's disclosure of the memoranda constituted a waiver of the attorney-client privilege.

determining whether the inadvertent disclosure of material that otherwise is protected by the attorney-client privilege constitutes a waiver of that privilege? "Generally [the voluntary] disclosure of confidential communications or attorney work product to a third party, such as an adversary in litigation, constitutes a waiver of [the] privilege as to those items. . . . Some courts, however, find an exception to the waiver of privilege when the disclosure is *inadvertent*." (Citations omitted; emphasis added; internal quotation marks omitted.) *Genentech, Inc.* v. *International Trade Commission*, 122 F.3d 1409, 1415 (Fed. Cir. 1997). We note that courts generally have followed one of three approaches in determining whether the attorney-client privilege has been waived as a result of the inadvertent disclosure of otherwise privileged material: (1) the lenient approach; (2) the strict approach; or (3) the "middle of the road" or moderate approach. E.g., *Gray* v. *Bicknell*, 86 F.3d 1472, 1483 (8th Cir. 1996).

"Under the lenient approach, [the] attorney-client privilege must be knowingly waived. [Under this approach], the determination of inadvertence is the end of the analysis. The attorney-client privilege exists for the benefit of the client and cannot be waived except by an intentional and knowing relinquishment. . . . The lenient test creates little incentive for lawyers to maintain tight control over privileged material. While the lenient test remains true to the core principle of [the] attorney-client privilege, which is that it exists to protect the client and must be waived by the client, it ignores the importance of confidentiality. To be privileged, attorney-client communications must remain confidential . . . and yet, under this test, the lack of confidentiality becomes meaningless so long as it occurred inadvertently.

"The second approach is known as the strict test. . . . Under the strict test, any document produced,

either intentionally or otherwise, loses its privileged status with the possible exception of situations [in which] all precautions were taken. Once waiver has occurred, it extends to all other communications relating to the same subject matter. . . .

"While the strict test has some appeal in that it makes attorneys and clients accountable for their carelessness in handling privileged matters . . . [it] sacrifices the value of protecting client confidences for the sake of certainty of results. . . . There is an important societal need for people to be able to employ and fully consult with those trained in the law for advice and guidance. . . . The strict test would likely impede the ability of attorneys to fill this need by chilling communications between attorneys and clients. If, when a document stamped attorney-client privileged is inadvertently released, it and all related documents lose their privileged status, then clients will have much greater hesitancy to fully inform their attorney.

"Finally, there is the middle test . . . . Under [this] . . . test, the court undertakes a five-step analysis of the unintentionally disclosed document to determine the proper range of privilege to extend. These considerations are (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosures, (4) the promptness of measures taken to rectify the disclosure, and (5) whether the overriding interest of justice would be served by relieving the party of its error. . . . If, after completing this analysis, the court determines that waiver occurred, then those documents are no longer privileged." (Citations omitted; internal quotation marks omitted.) Id., 1483–84.

We conclude that the "middle of the road" or moderate approach strikes the fairest balance between the

competing policy interests of preserving confidential attorney-client communications[27] and encouraging the party seeking the benefit of the attorney-client privilege to take care in the handling of otherwise privileged material.[28] This approach properly places a burden on that party to demonstrate that reasonable measures were taken to preserve the confidentiality of the material that inadvertently was disclosed notwithstanding those measures. Conversely, the approach allows for the recognition of waiver of the privilege when, in view of the totality of the circumstances, the party claiming the privilege has failed to take proper precautions to safeguard the confidentiality of the inadvertently disclosed material. Furthermore, this approach recognizes that the occasional inadvertent disclosure of privileged material is inevitable in the modern era of complex, document-intensive litigation. The moderate approach also recognizes that parties who seek legal advice reasonably may expect that the confidence of their communications with counsel will not be breached to their detriment by virtue of an excusable mistake or oversight in the handling of those communications.

[27] "On numerous occasions we have reaffirmed the importance of the attorney-client privilege and have recognized the long-standing, strong public policy of protecting attorney-client communications. . . . In Connecticut, the attorney-client privilege protects both the confidential giving of professional advice by an attorney acting in the capacity of a legal advisor to those who can act on it, as well as the giving of information to the lawyer to enable counsel to give sound and informed advice." (Citations omitted; internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156–57, 757 A.2d 14 (2000). "The privilege fosters full and frank communications between attorneys and their clients and thereby promote[s] the broader public interests in the observation of law and [the] administration of justice." (Internal quotation marks omitted.) Id., 157.

[28] It appears that a majority of courts have chosen to follow this approach. See, e.g., *Alldread* v. *Grenada*, 988 F.2d 1425, 1434 (5th Cir. 1993) ("[t]he majority of courts . . . have opted . . . for an approach which takes into account the facts surrounding a particular disclosure").

Under the moderate approach, the trial court has discretion to determine if a waiver of the attorney-client privilege has occurred and the scope of that waiver. E.g., id., 1484. The determination of whether the privilege has been waived generally will require "a detailed court inquiry into the document practices of the party who inadvertently released the document." Id. Furthermore, "as with all privileges, the [party] claiming the attorney-client privilege has the burden of establishing all essential elements." *In re Horowitz*, 482 F.2d 72, 82 (2d Cir.), cert. denied, 414 U.S. 867, 94 S. Ct. 64, 38 L. Ed. 2d 86 (1973); cf. *State* v. *Egan*, 37 Conn. App. 213, 217, 655 A.2d 802, cert. denied, 234 Conn. 905, 659 A.2d 1206 (1995). Because the party seeking to invoke the attorney-client privilege is responsible for maintaining the continued confidentiality of protected communications; see, e.g., *In re Von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987); that party also has the burden of showing that the inadvertent disclosure of those communications occurred even though reasonable precautions were taken to preserve the privilege.

Having identified the proper standard for determining whether a party's inadvertent disclosure of otherwise privileged material constitutes a waiver of the attorney-client privilege, we next must determine whether the trial court, *Moran, J.*, applied that test. Despite the brevity of its ruling,[29] we conclude that the trial court's express reliance on *Barnes* indicates that it used the correct test in determining that the disclosure of the legal strategies memoranda did not constitute a waiver of the attorney-client privilege in the present case.

In *Barnes*, the court rejected the strict approach to determining waiver in the context of inadvertent disclo-

---

[29] The court's order denying the plaintiff's motion to compel cited to *Barnes* and merely provided: "The foregoing motion is DENIED. This is a classic case of accidental, unintentional and inadvertent disclosure."

sure and adopted an approach that requires consideration of all relevant factors, including "the amount of documents involved and the degree of care taken to prevent inadvertent disclosure of privileged information." *Barnes/Science Associates Ltd. Partnership* v. *Barnes Engineering Co.*, supra, 1 Conn. L. Rptr. 725. Upon application of that test, the court in *Barnes* concluded that the accidental release of certain documents otherwise protected by the attorney-client privilege did not constitute a waiver of that privilege because: (1) the disclosure was not "knowing or intentional"; (2) the number of privileged documents disclosed as compared to the voluminous number of documents involved in the discovery request was extremely small; and (3) the production of the documents was not handled in a "careless" manner. Id. Thus, the court in *Barnes* properly considered the totality of the circumstances in determining whether, under the facts of that case, the accidental disclosure of the privileged material constituted a waiver of the attorney-client privilege. The citation to *Barnes* by the trial court, *Moran, J.*, indicates that it, too, employed that test in ruling on the plaintiff's motion to compel, and, therefore, we are satisfied that it applied the correct standard in evaluating the issue of waiver.

We now must determine whether the trial court, *Moran, J.*, properly applied the moderate approach to the facts of the present case. "At the outset, we recite the standard governing the review of a trial court's decision on a discovery motion. We have long recognized that the granting or denial of a discovery request rests in the sound discretion of the [trial] court, and is subject to reversal only if such an order constitutes an abuse of that discretion. . . . [I]t is only in rare instances that the trial court's decision will be disturbed. . . . Therefore, we must discern whether the

court could [have] reasonably conclude[d] as it did.
. . .

"The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Citations omitted; internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 155–56, 757 A.2d 14 (2000). Inasmuch as the facts relevant to this issue are not in dispute,[30] our task is limited to a determination of whether, on the basis of those facts, the trial court's conclusions of law are legally and logically correct. With these principles in mind, we turn to the issue before us.

The first factor, the reasonableness of the precautions taken by the holder of the privilege, weighs in the defendants' favor. The legal strategies memoranda were discovered by the plaintiff among the other documents that were maintained by Rentz in CHFA's general business files and made available to the plaintiff in connection with his freedom of information request. The memoranda were prominently stamped "privileged and confidential," and were included among the other documents requested by the plaintiff as a result of a clerk's filing error. Thus, the trial court reasonably could have inferred that the memoranda were made available to the plaintiff notwithstanding CHFA's policy and practice of maintaining the confidentiality of such documents by denoting them as privileged and confidential and segregating them from other, nonprivileged documents.

---

[30] See footnote 24 of this opinion.

Under the approach that we have adopted today, "[t]he mere fact of disclosure does not establish that a party's precautions undertaken to protect the privilege[d] [material] were unreasonable"; *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213, 222 (S.D.N.Y. 2001); because " 'reasonable precautions' are not necessarily foolproof." *Bank Brussels Lambert* v. *Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 443 (S.D.N.Y. 1995). Thus, despite the inadvertent disclosure of the legal strategies memoranda, the record supports the conclusion that CHFA made reasonable efforts to preserve the confidentiality of privileged material.

The second factor to be considered is the ratio of the number of privileged documents inadvertently disclosed to the total number of documents disclosed in accordance with the request for production. Although the record is devoid of any precise indication as to the magnitude of the plaintiff's freedom of information request, the defendants have characterized the number of documents produced as "voluminous," and explained that these documents were contained in "quite a few" boxes that occupied about one half of a conference room. Moreover, even though the plaintiff now claims that "[t]he total volume of documents disclosed . . . . was not unusually large," Jacquelyn Hanhurst, the bookkeeper for Renaissance, stated in an affidavit filed with the trial court that, "[w]e were provided with a great number of files for review, so we proceeded to review the records in two teams . . . over a number of days." Thus, the magnitude of the document production in relation to the two privileged documents that inadvertently were disclosed is a factor that militates strongly against a finding of waiver.

The third and fourth factors, namely, the extent of the inadvertent disclosures and the time taken to rectify the error, provide further support for the defendants'

position. Only two privileged documents inadvertently were disclosed. Moreover, CHFA did not delay upon learning that the legal strategies memoranda inadvertently had been made available to the plaintiff. As soon as CHFA personnel learned that the memoranda had been made available to the plaintiff, they explained to him that the memoranda were privileged and confidential and, consequently, not subject to disclosure. The employees therefore declined to fulfill the plaintiff's request for photocopies of the memoranda and would not permit the plaintiff to review the memoranda further. In addition, there is nothing in the record to suggest that the memoranda ever were made available to anyone else outside CHFA. Thus, once CHFA personnel learned of the unintended disclosure of the memoranda, they promptly took all steps necessary to minimize that disclosure.

Finally, we conclude that the fifth factor, namely, whether the overriding interest of fairness would be best served by relieving the party of its error, also favors the defendants. It is axiomatic that "[d]epriving a party of information in an otherwise privileged document is not prejudicial." *In re Copper Market Antitrust Litigation*, supra, 200 F.R.D. 223. Thus, "[t]he prejudice factor focuses only on whether the act of restoring immunity to an inadvertently disclosed document would be unfair, not whether the privilege itself deprives parties of pertinent information." *Bank Brussels Lambert* v. *Credit Lyonnais (Suisse) S.A.*, supra, 160 F.R.D. 446. In the present case, the legal strategies memoranda fall squarely within the attorney-client privilege. The disclosure of the memoranda clearly was inadvertent and was limited both in time and scope. Furthermore, CHFA rectified the error immediately upon learning of it. Although the plaintiff relied on the memoranda in deciding whether to bring this action against the defen-

dants;[31] see, e.g., *Hydraflow, Inc.* v. *Enidine, Inc.*, 145 F.R.D. 626, 638 (W.D.N.Y. 1993) (suggesting that reliance on inadvertently disclosed but otherwise privileged material by party claiming waiver may be considered in determination of whether fairness dictates finding of waiver); he did so with full knowledge that, at the very least, the defendants had a strong claim that the inadvertent disclosure of the memoranda did not constitute a waiver of the attorney-client privilege.[32]

Thus, the trial court's determination that, all relevant circumstances considered, the inadvertent disclosure of the legal strategies memoranda did not constitute a waiver of the attorney-client privilege is fully supported by the record.[33] We therefore reject the plaintiff's claim that the memoranda are not protected by the attorney-client privilege.[34]

---

[31] See footnote 39 of this opinion.

[32] Indeed, the plaintiff indicated in his deposition that, upon discovering the legal strategies memoranda among the documents produced in connection with his freedom of information request, he was surprised to learn that they had been included with the other documents.

[33] As we previously have noted, the determination of whether the inadvertent disclosure of material otherwise covered by the attorney-client privilege constitutes a waiver of that privilege generally will require a detailed factual inquiry regarding the circumstances of the disclosure, including efforts made by the party claiming the privilege to ensure the confidentiality of such material. In most cases, therefore, an evidentiary hearing will be necessary to air those circumstances fully. Because the parties to the present case proceeded on undisputed facts, however, and because those facts are sufficient for the purpose of resolving the issues presented by this appeal, we also proceed on that basis. In the future, however, a fuller record developed during an evidentiary hearing generally will be necessary to provide the court with a complete picture of the relevant facts and circumstances.

[34] The plaintiff makes two additional claims, both of which are without merit. First, the plaintiff contends that, because the client, CHFA, inadvertently disclosed the legal strategies memoranda, rather than its counsel, we should not look to whether the disclosure was excusable in light of all the circumstances. We are aware of no authority, and the plaintiff has presented us with none, to substantiate this assertion. Indeed, there is no reason why the approach that we have adopted today is not equally applicable to inadvertent disclosures by counsel and client alike.

The plaintiff also claims that "the defendants have waived the privilege

## II

The plaintiff next claims that the trial court, *Devlin, J.*, improperly granted the defendants' motions for summary judgment on the ground that the plaintiff's claims are barred by the intracorporate conspiracy doctrine. We agree with the trial court that, although the plaintiff's complaint does not expressly allege a conspiracy between and among the defendants, the allegations of the complaint nevertheless set out a claim of intracorporate conspiracy. We also agree with the trial court that the plaintiff's claims therefore are barred. Consequently, we conclude that the court properly granted the defendants' motions for summary judgment.

We first set forth the contours of the intracorporate conspiracy doctrine. "Courts in other jurisdictions—both federal and state—that have addressed issues involving civil intracorporate conspiracy allegations have adopted the intracorporate conspiracy immunity doctrine to hold that wholly intracorporate conduct does not satisfy the plurality requirement necessary to establish an actionable conspiracy claim. This single entity view of intracorporate conduct derives from traditional principles of agency law. A basic principle of agency is that a corporation can act only through the authorized acts of its corporate directors, officers, and other employees and agents. Thus, the acts of the corpo-

by implementing in a public forum the very plan that was set forth in the [legal] [s]trategies memoranda." The plaintiff also has failed to provide any support for this claim. Even if we assume, arguendo, that the memoranda recommended a plan that the defendants implemented publicly, that fact alone would not amount to a waiver of the attorney-client privilege; to conclude otherwise would mean that a client waives the privilege anytime he or she takes counsel's advice and acts publicly on it, irrespective of whether the advice itself has been made public. We reject as untenable such a limited view of the attorney-client privilege.

ration's agents are attributed to the corporation itself."[35] (Internal quotation marks omitted.) *Trau-Med of America, Inc.* v. *Allstate Ins. Co.,* 71 S.W.3d 691, 703 (Tenn. 2002); see also *Day* v. *General Electric Credit Corp.,* 15 Conn. App. 677, 684, 546 A.2d 315, cert. denied, 209 Conn. 819, 551 A.2d 755 (1988) (applying intracorporate conspiracy doctrine).

Nonetheless, "[t]he intracorporate conspiracy doctrine, if applied too broadly, could immunize all private conspiracies from redress where the actors coincident[ly] were employees of the same company. Aware of this possibility, courts have created a 'scope of employment' exception that recognizes a distinction between collaborative acts done in pursuit of an employer's business and private acts done by persons who happen to work at the same place." *Johnson* v. *Hills & Dales General Hospital,* 40 F.3d 837, 840 (6th Cir. 1994), cert. denied, 514 U.S. 1066, 115 S. Ct. 1698, 131 L. Ed. 2d 560 (1995).

The Connecticut Appellate Court has applied the intracorporate conspiracy doctrine in concluding that employees acting within the scope of their employment cannot conspire with each other or with the corporation that employs them. *Day* v. *General Electric Credit Corp.,* supra, 15 Conn. App. 684. Because, as the trial court noted, the doctrine is founded on the "common sense proposition that one cannot conspire with himself," we agree with the Appellate Court that the doctrine, when applicable, bars a complainant from proceeding on a conspiracy theory against corporate employees acting within the scope of their employment.

---

[35] We note that the plaintiff makes no claim that the intracorporate conspiracy doctrine is inapplicable to governmental or quasi-governmental entities. See, e.g., *Denney* v. *Albany,* 247 F.3d 1172, 1190 (11th Cir. 2001) (doctrine applies to public entities); *Larson ex rel. Larson* v. *Miller,* 76 F.3d 1446, 1456 n.6 (8th Cir. 1996) (same); see also *Hilliard* v. *Ferguson,* 30 F.3d 649, 653 (5th Cir. 1994) (applying doctrine to local school board).

The plaintiff claims, however, that the intracorporate conspiracy doctrine is inapplicable to the present case because: (1) he has not alleged a conspiracy; (2) CHFA is not a party to this action; and (3) even if the doctrine is applicable, the defendants have failed to establish a necessary component of the doctrine, namely, that they were acting within the scope of their employment when they engaged in their allegedly tortious conduct. We reject each of these claims, which we address in turn.[36]

A

The plaintiff first contends that the trial court improperly concluded that the plaintiff's claims sound in conspiracy and, therefore, are barred by the intracorporate conspiracy doctrine. In particular, the plaintiff maintains that he has alleged only that the defendants acted jointly, or in concert, and not that they had conspired together. We disagree.

Although the complaint does not contain the term "conspiracy," we conclude nevertheless that the plain-

---

[36] Preliminarily, we set forth the well established standards that govern our review of a trial court's decision to grant a motion for summary judgment. "Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. Practice Book [§ 17-46]." (Internal quotation marks omitted.) *Community Action for Greater Middlesex County, Inc.* v. *American Alliance Ins. Co.*, 254 Conn. 387, 397–98, 757 A.2d 1074 (2000). "A material fact . . . [is] a fact which will make a difference in the result of the case. . . . Finally, the scope of our review of the trial court's decision to grant the plaintiff's motion for summary judgment is plenary." (Citation omitted; internal quotation marks omitted.) *H.O.R.S.E. of Connecticut, Inc.* v. *Washington*, 258 Conn. 553, 560, 783 A.2d 993 (2001).

tiff has alleged a civil conspiracy.[37] "The [elements] of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." (Internal quotation marks omitted.) *Marshak* v. *Marshak*, 226 Conn. 652, 665, 628 A.2d 964 (1993).

In the present case, the plaintiff alleged in his complaint, inter alia, that the defendants' "joint action" defamed him, invaded his privacy, tortiously interfered with his business expectancies and caused him emotional distress. The plaintiff further alleged in the complaint that "the defendants *agreed* to deprive the plaintiff of his property and his profession," thereby causing him emotional distress and economic loss. (Emphasis added.) These allegations comprise the essence of a civil conspiracy, namely, two or more persons acting together to achieve a shared goal that results in injury to another.

Indeed, in his deposition, the plaintiff characterizes the defendants' joint conduct as a conspiracy. For example, the plaintiff stated that the legal strategies memoranda "made . . . the leap from . . . a legal assessment to a *conspiratorial* assessment . . . ." (Emphasis added.) Later in his deposition, in regard to the fact that CHFA had apprised him that he was in default, the plaintiff stated, "I'm denying the fairness of that action. I'm not denying the fact that CHFA did it. Obviously, that's a purpose of this lawsuit, to contest

---

[37] We note that there is no independent claim of civil conspiracy. Rather, "[t]he action is for damages caused *by acts committed pursuant to a formed conspiracy* rather than by the conspiracy itself." (Emphasis added; internal quotation marks omitted.) *Marshak* v. *Marshak*, 226 Conn. 652, 669, 628 A.2d 964 (1993). Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort.

the fact it was discriminatory, unfair, capricious, *conspiratorial* and shameful." (Emphasis added.) Thus, even though the complaint does not contain an express allegation that the defendants engaged in a conspiracy to harm the plaintiff professionally, the plaintiff's claims all are founded on a conspiracy theory.

The plaintiff contends that the defendants are jointly liable because they acted in concert, not because they were part of a conspiracy. In essence, the plaintiff attempts to draw a distinction between parties "acting in concert" and parties acting pursuant to a "common design." In support of this contention, the plaintiff relies on the comments to § 876 (a) of the Restatement (Second) of Torts, which define "acting in concert" as acts done "in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result," and equate "acts done pursuant to a common design or plan" with the term "conspiracy." 4 Restatement (Second), Torts § 876 (a), comments (a) and (b), p. 316 (1979).[38] For present purposes, however,

---

[38] Section 876 of the Restatement (Second) of Torts provides in relevant part: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

"(a) does a tortious act in concert with the other or pursuant to a common design with him . . . ." 4 Restatement (Second), supra, § 876 (a), p. 315.

Comment (a) to § 876 (a) of the Restatement (Second) of Torts provides: "Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself. Whenever two or more persons commit tortious acts in concert, each becomes subject to liability for the acts of the others, as well as for his own acts. The theory of the early common law was that there was a mutual agency of each to act for the others, which made all liable for the tortious acts of any one." Id., comment (a), p. 316.

Comment (b) to § 876 (a) of the Restatement (Second) of Torts provides in relevant part: "The same rule is applicable, in general, to tortious acts done pursuant to a common design or plan for cooperation in a tortious line of conduct or to accomplish a tortious end. It is in connection with these common designs or plans that the word 'conspiracy' is often used. The mere common plan, design or even express agreement is not enough

we find no meaningful distinction between "concerted action" and acts done pursuant to a "common design." In each case, one or more persons, by express or tacit agreement, act in combination with another for a particular purpose or to attain a particular end. Because such conduct forms the crux of the plaintiff's claims, we agree with the trial court that the plaintiff has alleged a civil conspiracy.

## B

We next address the plaintiff's claim that the intracorporate conspiracy doctrine is inapplicable because he does not seek to hold CHFA liable. In particular, he contends that the doctrine applies only to conspiracies between an employee and the corporation itself. We are not persuaded.

Although CHFA is not a party to this action, the act of "[s]imply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation." *Cole* v. *University of Hartford*, 391 F. Sup. 888, 893 (D. Conn. 1975); accord *Buschi* v. *Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985). Thus, "[e]mployees of a corporation acting in the scope of their employment cannot conspire *with one another* or with the corporation that employs them; each acts for the corporation and the corporation cannot conspire with itself." (Emphasis added.) *Day* v. *General Electric Credit Corp.*, supra, 15 Conn. App. 684; see also *Jackson* v. *Columbus*, 194 F.3d 737, 753 (6th Cir. 1999) (members of same legal entity cannot conspire with one another as long as their alleged acts are within scope of employment), overruled in part on other grounds by *Swierkiewicz* v. *Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); *Benningfield* v. *Houston*, 157 F.3d

for liability in itself, and there must be acts of a tortious character in carrying it into execution. . . ." Id., comment (b), p. 316.

369, 378 (5th Cir. 1998) ("a corporate entity and its employees constitute a single legal entity [that] is incapable of conspiring with itself" [internal quotation marks omitted]), cert. denied sub nom. *Benningfield* v. *Nuchia*, 526 U.S. 1065, 119 S. Ct. 1457, 143 L. Ed. 2d 543 (1999). But see *Novotny* v. *Great American Federal Savings & Loan Assn.*, 584 F.2d 1235, 1259 (3d Cir. 1978) (intracorporate conspiracy doctrine inapplicable to allegations of conspiracy among individual defendants only), vacated on other grounds, 442 U.S. 366, 99 S. Ct. 2345, 60 L. Ed. 2d 957 (1979). The same principles that preclude a conspiracy claim between principal and agent apply to a claim of conspiracy among employees acting on behalf of the same corporate entity. We therefore reject the plaintiff's claim that the intracorporate conspiracy doctrine bars only those actions in which the corporation is alleged to have conspired with one or more of its employees.

C

Finally, the plaintiff contends that his claims are not barred by the intracorporate conspiracy doctrine because the defendants were not acting within the scope of their employment when they engaged in their allegedly tortious conduct. We also reject this claim.

"[F]or a claim of intracorporate conspiracy to be actionable, the complaint must allege that corporate officials, employees, or other agents acted outside the scope of their employment and engaged in conspiratorial conduct to further their own personal purposes and not those of the corporation." *Trau-Med of America, Inc.* v. *Allstate Ins. Co.*, supra, 71 S.W.3d 704. In other words, the employee's allegedly wrongful conduct must be in furtherance of personal considerations unrelated or extraneous to the corporation's interest. In determining whether an employee has acted within the scope of employment, courts look to whether the employee's

conduct: (1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer. See 1 Restatement (Second), Agency § 228, p. 504 (1958).

"Ordinarily, it is a question of fact as to whether a wilful tort of the servant has occurred within the scope of the servant's employment . . . [b]ut there are occasional cases [in which] a servant's digression from [or adherence to] duty is so clear-cut that the disposition of the case becomes a matter of law." (Citation omitted; internal quotation marks omitted.) *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 207, 579 A.2d 69 (1990). We agree with the trial court that this is such a case because, in the absence of the legal strategies memoranda; see part I of this opinion; there is nothing in the record from which a fact finder could conclude that the defendants' allegedly tortious conduct had occurred outside the scope of their employment.[39]

The plaintiff offers the following evidence in support of his claim of disparate, unfair and discriminatory treatment by the defendants: (1) the allegedly unprecedented nature of Rentz' "forensic audits"; (2) the declaration that the plaintiff was in "technical default" owing to his failure to submit to CHFA timely financial reports on the developments; (3) the imposition of harsh and unduly restrictive conditions on Renaissance in its continued management of the developments; and (4) the charging of higher interest rates on the loans on the plaintiff's CHFA-financed properties than the interest rates on loans assumed by other similarly situated, non-

---

[39] Indeed, at oral argument on the plaintiff's motion to compel production of the legal strategies memoranda, counsel for the plaintiff acknowledged that those memoranda formed the basis of the plaintiff's claims and, further, had the memoranda not been produced, "this lawsuit would never have been filed."

minority developers. Although this evidence, if credited, tends to support the plaintiff's claim of disparate and unfair treatment, the defendants' allegedly improper conduct occurred during working hours and in the discharge of official CHFA business.[40] Moreover, even if we were to assume that the defendants may have been motivated, in part, to engage in the allegedly tortious conduct because they did not like the plaintiff and were seeking to harm him, that conduct nevertheless involved activities that fell within the purview of the defendants' core duties.

The plaintiff also claims that his allegedly disparate treatment was due, in some measure, to his race. This claim is predicated largely on the deposition testimony of Lenward Gatison, a former vice president of CHFA, who stated that King, in particular, had made the plaintiff "jump through hoops," in part because of his race and in part because the plaintiff had taken CHFA personnel "to task" when he believed that they were doing something improper. King, however, is the only defendant that Gatison identifies as being motivated by racial considerations, and the plaintiff has provided no support for his assertion that King's alleged racial animus

---

[40] In support of his challenge to the decision of the trial court to grant the defendants' motions for summary judgment, the plaintiff also relies on the fact that Bass, the New Haven Advocate reporter, had a confidential source within CHFA who told him that, unbeknownst to the plaintiff, CHFA had planned to declare the plaintiff in default of his loans. The plaintiff, however, has failed to establish that any one of the defendants was the source of that information. In the absence of such proof, the fact that Bass had a confidential source within CHFA provides no support for his contention that the court improperly granted the defendants' motions for summary judgment.

The record does indicate that Flynn provided information to Bass. Even if we assume, arguendo, that some of the information that Flynn gave to Bass was false and derogatory, Flynn provided the information in connection with his response, on behalf of CHFA, to Bass' freedom of information request. Consequently, Flynn's communications with Bass were within the scope of Flynn's employment with CHFA.

is attributable to the other defendants. Moreover, the plaintiff has not sought to differentiate between King and the other defendants insofar as his challenge to the trial court's decision on the defendants' motions for summary judgment is concerned. Finally, even if we assume, arguendo, that King's actions were motivated, in part, by the plaintiff's race, the plaintiff has failed to explain why such actions and the actions of the other defendants fell outside the scope of the defendants' employment even though all of those actions were undertaken in the discharge of the defendants' official duties and in the furtherance of CHFA business.[41] Thus, even if the conduct of King or the other defendants was motivated, in part, by improper considerations, the plaintiff nevertheless has failed to establish that the defendants were acting outside the scope of their employment when they engaged in the allegedly tortious conduct that forms the basis of the plaintiff's claims.

We conclude that, although the plaintiff produced admissible evidence which, if credited, might be sufficient to establish that the defendants had treated him unfairly or inequitably, the defendants' conduct occurred within the scope of their official duties and, consequently, that conduct also fell within the purview of the intracorporate conspiracy doctrine. "If the measure of the applicability of [that] . . . doctrine was keyed to the alleged wrongdoing of corporate officers, it would quickly become a meaningless concept. In every case of conspiracy. . . there are necessarily accusations of wrongful conduct. The test [therefore] is not the wrongful nature of the conspirators' actions but whether the wrongful conduct was performed within

---

[41] Inasmuch as the plaintiff has provided no support for his contention that racially motivated conduct constitutes an exception to the intracorporate conspiracy doctrine, we need not decide whether, in an appropriate case, that conduct may constitute such an exception.

the scope of the conspirators' official duties." *Doe* v. *Board of Education*, 833 F. Sup. 1366, 1382 (N.D. Ill. 1993). An employee acts within the scope of his employment as long as he is discharging his duties or endeavoring to do his job, "no matter how irregularly, or with what disregard of instructions."[42] (Internal quotation marks omitted.) *Ierardi* v. *Sisco*, 119 F.3d 183, 187 (2d Cir. 1997). Consequently, the plaintiff's contention that the defendants were not acting within the scope of their employment when they engaged in the allegedly tortious conduct that forms the basis of his claims is without merit.[43]

### III

The plaintiff's final contention is that, even if the trial court properly had ruled on the applicability of the intracorporate conspiracy doctrine, summary judgment was not warranted in regard to his claim that the defendants had tortiously interfered with his business expec-

[42] We do not suggest, of course, that corporate employees may not be held liable for tortious conduct in which they jointly engage. We merely conclude, rather, that such persons cannot conspire with one another or with the corporation when they are acting within the scope of their employment.

[43] The plaintiff also asserts that the defendants "created" false reports regarding his financial dealings and management operations. Although the plaintiff has adduced evidence tending to contradict those reports, his allegation that the reports were created or fabricated to cast him in a negative light is not substantiated by admissible evidence. Indeed, the only support for the plaintiff's claim purportedly is contained in the legal strategies memoranda, which, as we have explained, are privileged and, therefore, inadmissible. See part I of this opinion. "Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Internal quotation marks omitted.) *Maffucci* v. *Royal Park Ltd. Partnership*, 243 Conn. 552, 554–55, 707 A.2d 15 (1998). Consequently, the plaintiff's claim that the defendants created or fabricated the reports for an improper purpose provides no support for the plaintiff's contention that the court improperly had granted the defendants' motions for summary judgment.

tancies, namely Renaissance's management contracts with CHFA.[44] We disagree.

Although we construe pleadings "broadly and realistically, rather than narrowly and technically"; (internal quotation marks omitted) *Doe* v. *Yale University*, 252 Conn. 641, 667, 748 A.2d 834 (2000); the plaintiff's claim of tortious interference with business expectancies, like his other claims, is wholly predicated upon his claim that the defendants implemented a scheme to deprive him of his ownership and management interests in the developments. See part II of this opinion. Indeed, the plaintiff never has alleged that each defendant is liable irrespective of the conduct of any other defendant; in fact, the plaintiff's complaint repeatedly refers to the defendants' "joint action." Moreover, the plaintiff seeks to hold the defendants jointly and severally liable for their joint conduct. We conclude, therefore, that the plaintiff's claim for tortious interference with business expectancies is barred by the intracorporate conspiracy doctrine.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[44] The defendants also contend that the plaintiff has no standing to bring a claim for tortious interference with business expectancies because that claim relates solely to Renaissance's contractual relationship with CHFA. We reject this claim because, as we previously have indicated, the defendants have treated Renaissance and the plaintiff as a single entity. See footnote 7 of this opinion.