Mark S. WILLIAMS, Gerald Doucette, Jr., and Juan Villafane, Plaintiffs,

v.

COMMUNITY SOLUTIONS, INC., Sean Ball, Frederick Lester, Terry Borjeson, Theresa C. Lantz, Randy Braren, Thomas O'Connor, Sondra Montesi, Michael Lajoie, John A. Danaher, III, Sharon M. Cheeks, Carolynn Lindley, Brian Zawilinski, and Christine Whidden, Defendants.

Civil No. 3:10cv01553(AWT).

United States District Court, D. Connecticut.

March 25, 2013.

Rachel M. Baird, Law Offices of Rachel
M. Baird, Torrington, CT, for Plaintiffs.

David G. Hill, Joseph James Blyskal, III, David G. Hill & Associates, LLC, Glastonbury, CT, Katrena K. Engstrom, John R. Williams, John R. Williams and Associates, LLP, New Haven, CT, Lynn D. Wittenbrink, Attorney General's Office, Hartford, CT, for Defendants.

## *RULING ON MOTION TO DISMISS*

ALVIN W. THOMPSON, District Judge.

Plaintiffs Mark S. Williams ("Williams"), Gerald Doucette, Jr. ("Doucette"), and Juan Villafane ("Villafane") claim they were subjected to sexual abuse, harassment, and threatening conduct at the Drapelick Center, a residential re-entry work-release program located in Bloomfield Connecticut. Their Amended Complaint (Doc. No. 13), which is the operative complaint (the "Complaint"), asserts claims pursuant to 42 U.S.C. § 1983 for violations of the Eighth Amendment (Count One), the Fifth Amendment (Count Two), the Fourteenth Amendment (Count Three), the Fourth Amendment (Count Four), and the First Amendment (Count Nine), as well as common law claims for assault and battery (Count Five), negligent hiring, retention and supervision (Count Six), intentional infliction of emotional distress (Count Seven), negligent infliction of emotional distress (Count Eight), and invasion of privacy (Count Nine).

The instant motion to dismiss was filed by a subset of the defendants [1] (the "State Defendants"). The State Defendants are the following individuals:

(i) Current and former employees of the Connecticut Department of Correction (the "DOC Defendants")

| | |
|---|---|
| Lantz | Former Commissioner of DOC Theresa C. Lantz |
| Braren | Former Director of Parole and Community Services Randy Braren |
| O'Connor | Parole and Community Services Residential Unit Manager Thomas O'Connor |
| Montesi | Parole Supervisor Sondra Montesi |
| Lindley | Parole Officer II Carolynn Lindley |
| Lajoie | Director of Security Michael Lajoie |
| Zawilinski | Security Division Investigator Brian Zawilinski |
| Whidden | Warden Christine Whidden |

(ii) Current and former employees of the Connecticut Department of Public Safety (the "DPS Defendants")

| | |
|---|---|
| Danaher | Former DPS Commissioner John A. Danaher, III |
| Cheeks | DPS Trooper Sharon Cheeks |

Each of the State Defendants was sued in his or her individual capacity. The State Defendants have moved to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6).[2]

1. The remaining defendants are Community Solutions, Inc. and its current or former employees.

2. The State Defendants also argue that the plaintiffs have not sufficiently alleged personal involvement by the State Defendants as required to state a claim against them under 42 U.S.C. § 1983 and that the Complaint should be dismissed as to the State Defendants under the doctrine of qualified immuni-

Subsequent to the filing of the instant motion to dismiss, Williams voluntarily dismissed his claims against the State Defendants, rendering the motion to dismiss moot with respect to Williams's claims in Counts One through Eight and with respect to Count Nine (a claim made by Williams only against Whidden only) in its entirety. Therefore, the court addresses only the claims by Doucette and Villafane against the State Defendants, and the motion to dismiss is being granted as to all such claims.

## I. FACTUAL ALLEGATIONS

"The complaint, which [the court] must accept as true for purposes of testing its sufficiency, alleges the following circumstances." *Monsky v. Moraghan*, 127 F.3d 243, 244 (2d Cir.1997).

The Drapelick Center is a residential re-entry work-release program located in Bloomfield Connecticut. It is operated by Community Solutions, Inc. ("CSI"), a non-profit corporation that contracted with the State of Connecticut to provide residential and non-residential supervision, treatment, and services for DOC inmates.

Villafane entered the Drapelick Center on or about September 1, 2007. On January 16, 2008, Villafane submitted a grievance to Drapelick Center Program Director Sean Ball ("Ball") complaining that Frederick Lester ("Lester"), a Drapelick Center employee, had stayed in the bathroom with Villafane while Villafane gave urine samples and, on January 6, 2008, had asked Villafane to give a urine sample even though no urine testing kit was available. Additionally, Lester touched and groped Villafane's genital area and buttocks while Villafane was a resident of the Drapelick Center.

Doucette entered the Drapelick Center on November 1, 2007. That day, Lester touched and groped Doucette's genital area and buttocks. On December 4, 2007, while Doucette gave a required urine sample, Lester stood with his chin on Doucette's shoulder and commented on Doucette's private areas. On December 21, 2007, Lester again touched and groped Doucette's genital area and buttocks. Ball was aware of the sexual abuse of Doucette by Lester, but took no action. Additionally, at some point, Ball told Doucette that Doucette was gay.

At some point, Doucette complained to Lindley that Lester had groped him during pat-downs and "Lindley told Doucette that she had received complaints about Lester before and that Doucette should not start something that he could not win." (Compl. ¶ 130.) On or around December 17, 2007, Doucette told Lindley he could not stay at the Drapelick Center due to the sexual abuse, and Lindley told Doucette she would arrange for his release within days. On December 21, 2007, after having his genitals and buttocks touched by Lester, Doucette left the Drapelick Center without permission. As a result, Doucette was charged with escape in the first degree, for which he was sentenced to an unconditional discharge.

While the escape charge was pending against Doucette, Jeff Chambers ("Chambers"), an investigator with the public defender's office, contacted Zawilinski and Cheeks. In February 2008, Zawilinski informed Chambers of two investigations into Doucette's complaint—an internal investigation by DOC and a criminal investigation by DPS. Zawilinski further informed Chambers that he believed that Doucette's grievance was legitimate.

ty. Because the court dismisses all the counts pending against the State Defendants on other grounds, the court does not reach these arguments.

In March 2008, Cheeks told Chambers "that there seemed to be something to Doucette's claim" but that further investigation was required. (Compl. ¶ 142.) In a report prepared by Cheeks a year later, she indicated that no action was taken in the DPS investigation between January 8, 2008 and November 30, 2008. In June 2009, the DPS investigation was transferred from Cheeks to DPS Central District Major Crimes Unit.

As early as July 2007, Lindley was made aware of complaints relating to sexual abuse or harassment made by Drapelick Center residents. At some time, she reported at least one complaint made in July 2007 to O'Connor.

On October 17, 2007, Williams, a resident of the Drapelick Center, complained to Lindley about abuse by Ball and Lester. Lindley drafted a DOC Incident Report dated October 18, 2007 that included Williams's reports of abuse. That report was directed to Ball, Montesi, and CSI Area Director Terry Borjeson ("Borjeson").

As of November 17, 2007, Williams had received no response to his complaint. That day, he handed DOC Deputy Warden Monica Rinaldi ("Rinaldi") an Inmate Request Form complaining of sexual harassment at a DOC community supervised halfway house. On November 19, 2007, Rinaldi emailed Montesi that the halfway house referenced in Williams's Inmate Request Form was the Drapelick Center. On November 23, 2007, Lantz directed Lajoie to begin a DOC Security Division investigation into "possible undue familiarity involving staff at Drapelick Center." (Compl. ¶ 50.)

Zawilinski was assigned to the DOC investigation. On February 14, 2008, Zawilinski interviewed Williams. On February 29, 2008, Zawilinski met with Borjeson and CSI Human Resources Vice President Edward Palasek to review Williams's allegations. In May and June 2008, Zawilinski conducted interviews of Drapelick Center staff members, in which he was told that "Ball had pictures of the private parts of male inmates on his cell phone, that Ball would allow male inmates to drive Ball around in Ball's car, that male inmates had been to Ball's house, and that Ball would destroy disciplinary reports for inmates who acquiesced to Ball's sexual demands," as well as "that inmates used drugs and alcohol, that Ball allowed inmates to use cell phones in his presence, and that Ball would be absent from the Drapelick Center with an inmate for two or three hours daily." (Compl. ¶¶ 64–65.) On August 25, 2008, Zawilinski submitted an Investigation Report to Lantz. On March 10, 2009, Zawilinski informed Braren that the case was complete.

At some point, six recommendations for DOC halfway houses and transitional facilities were prepared. The recommendations included requiring CSI to prepare a written plan and submit to audits, requiring transitional facility staff to attend training sessions, and having unannounced DOC audits of all contracted facilities. In February 2009, Lantz, Lajoie, and Braren represented that these recommendations had been or were in the process of being implemented, although in October 2010, CSI Chief Executive Officer Walter Pidgeon was quoted in a news article as saying he had never heard of the recommendations. On March 10, 2009, Lantz recommended that O'Connor, Montesi, and a representative of DOC's Grants and Contracts Unit be empanelled to review these recommendations.

While investigations into sexual abuse at the Drapelick Center were ongoing, Lester and Ball were terminated as CSI employees. Lester was terminated on January 24, 2008. Ball informed Lester that

Lester was terminated for "unethical behavior" that violated "a client's right to privacy and comprises the integrity of the program." (Compl. ¶ 59.) Ball was terminated on June 30, 2008 by Borjeson due to an "ongoing investigation into allegations of staff impropriety at the Drapelick Center." (Compl. ¶ 60.)

## II. LEGAL STANDARD

■ When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (citations omitted). However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. "The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to

assay the weight of the evidence which might be offered in support thereof.'" *Mytych v. May Dept. Stores Co.,* 34 F.Supp.2d 130, 131 (D.Conn.1999), quoting *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." *United States v. Yale New Haven Hosp.,* 727 F.Supp. 784, 786 (D.Conn.1990) (citing *Scheuer,* 416 U.S. at 232, 94 S.Ct. 1683).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

## III. DISCUSSION

### A. Count One: 42 U.S.C. § 1983 and Eighth Amendment

■ In Count One, the plaintiffs bring a claim against all the State Defendants under 42 U.S.C. § 1983. The plaintiffs assert that the alleged abuse, harassment, and threats by Ball and Lester were a condition of confinement at the Drapelick Center that violated the plaintiffs' Eighth Amendment right to be free of cruel and unusual punishment. In particular, the plaintiffs claim that Lindley conspired with and aided and abetted Ball and Lester in the sexual abuse, harassment, and threats by "exercising her authority to return the Plaintiffs to actual DOC custody if Ball and Lester reported the Plaintiffs to be in violation of Drapelick Center 'policies'" (Compl. ¶ 194); that other State Defendants were deliberately indifferent to the sexual abuse of Drapelick residents; and that all the "DOC [D]efendants were

grossly negligent in managing subordinates who caused the unlawful conditions and events at the Drapelick Center" (Compl. ¶ 199).

To establish a violation of the Eighth Amendment by a prison official, an inmate must show (1) that the alleged deprivation was objectively "sufficiently serious" and (2) that a prison official had a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997) (applying the *Farmer* test to a prisoner's claim of sexual abuse by a prison officer). "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970.

The Second Circuit has held that "the sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim under Section 1983." *Boddie,* 105 F.3d at 859. In *Boddie,* the court held that the plaintiff's Eighth Amendment rights were not violated where the plaintiff claimed a corrections officer "made a pass" at him, squeezed has hand, touched his penis, called him a "sexy black devil," and pressed her breasts to his chest and her vagina to his penis. *Id.* The court explained that the plaintiff

> assert[ed] a small number of incidents in which he allegedly was verbally harassed, touched, and pressed against without his consent. No single incident that he described was severe enough to be "objectively, sufficiently serious." Nor were the incidents cumulatively

egregious in the harm they inflicted. The isolated episodes of harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.

*Id.* at 861.

Likewise, Doucette and Villafane's allegations of sexual abuse and harassment, do not rise to the level of a constitutional violation. Villafane alleges that Lester stayed in the bathroom with Villafane while Villafane gave urine samples, once asked Villafane to give a urine sample even though no urine testing kits were available, and touched and groped Villafane's genital area and buttocks on an unspecified number of occasions. Doucette alleges that Lester touched and groped Doucette's genital area and buttocks on two occasions, and once stood with his chin on Doucette's shoulder and commented on Doucette's private areas while Doucette gave a required urine sample. Like the allegations made in *Boddie,* these allegations concern a small number of isolated incidents that include some physical contact. While appalling, these allegations are not more serious than those at issue in *Boddie.* Thus, Doucette and Villafane have not alleged facts that could establish a sufficiently serious deprivation such that their rights under the Eighth Amendment were violated by the deliberate indifference of State Defendants.[3]

Because the alleged conduct is not sufficiently serious to violate the Eighth Amendment, the Complaint does not state a claim upon which any of the State Defen-

---

**3.** Because both prongs of the *Farmer* test must be met to establish a violation of the Eighth Amendment and the court concludes that the Complaint has not alleged facts that could establish the first prong, the court does not consider the second prong, i.e., whether the Complaint alleges that each official had a "sufficiently culpable state of mind" for a violation.

dants could be held liable for violating the plaintiffs' rights under the Eighth Amendment, including under theories of conspiracy, aiding and abetting, or supervisor liability. *See Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir.1999) ("for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation").

Therefore, Count One is being dismissed with respect to the State Defendants.

### B. Count Two: 42 U.S.C. § 1983 and Fifth Amendment

Count Two, which is brought against all the State Defendants, asserts a claim under § 1983 for violation of the plaintiffs' Fifth Amendment rights. Count Two incorporates the factual allegations of Count One and adds only that the "Plaintiffs have suffered and continue to suffer severe physical and psychological harm caused by the actions alleged in Count Two and have incurred and continue to incur both economic and non-economic damages." (Compl. ¶ 207.)

It is not clear what claim the plaintiffs are attempting to assert in Count Two. The plaintiffs may be attempting to claim that their due process rights were violated. *See* U.S. Const. amend. V ("No person shall be ... deprived of life, liberty, or property, without due process of law ..."). The Complaint alleges that Drapelick Center "inmates" were threatened "with prolonged imprisonment and discipline if they refused or complained about the sexually abusive, harassing, and threatening demands upon their persons by the CSI employees." (Compl. ¶ 5.) However, the Complaint does not allege facts that could establish a deprivation of life, liberty, or property suffered by the plaintiffs.

Alternatively, the plaintiffs may be attempting to assert a claim of cruel and unusual punishment in violation of the Fifth Amendment. However, Fifth Amendment protections against cruel and unusual punishment typically apply to pretrial detainees and not to inmates. *See Akande v. Graser*, No. 3:08cv188(WWE), 2010 WL 3802901, at *3 (D.Conn. Sept. 17, 2010) ("The Supreme Court has held that, although the Eighth Amendment's protections of prisoners from cruel and unusual punishment due to the deliberate indifference to serious medical needs do not specifically apply to pretrial detainees, the protections afforded pretrial detainees under the Due Process Clause are at least as great as the Eighth Amendment protections available to a convicted prisoner." (internal quotation marks omitted)); *Varon v. Sawyer*, No. 3:04cv2049(RNC), 2006 WL 798880, at n. 1 (noting that an inmate's claims of sexual abuse were governed by the Eighth Amendment and not the Fifth Amendment) (citing *Peddle v. Sawyer*, 64 F.Supp.2d 12, 17 (D.Conn.1999)). The plaintiffs here are not alleged to have been pretrial detainees at the time of the conduct at issue in the Complaint.

Therefore, Count Two fails to state a claim upon which relief may be granted, and it is being dismissed with respect to the State Defendants.

### C. Count Three: 42 U.S.C. §§ 1981 and 1983

Count Three is brought against all the State Defendants by all three plaintiffs, but only alleges conduct relating to the treatment of Williams, i.e., that Williams was discriminated against based on his race and status as an inmate. Because Williams voluntarily dismissed his claims against all the State Defendants and Count Three does not allege any facts regarding actions by the State Defendants with respect to Doucette or Villafane, Count Three is being dismissed with respect to the State Defendants.

### D. Count Four: 42 U.S.C. § 1983 and Fourth Amendment

■ Count Four, which is brought against the DOC Defendants, asserts that Ball and Lester violated the plaintiffs' "constitutional right to bodily privacy." (Compl. ¶ 214.) With respect to the DOC Defendants, the Complaint alleges that Lindley conspired and aided and abetted Ball and Lester in violating the plaintiffs' right to bodily privacy; that all the DOC Defendants except for Lindley and Whidden were deliberately indifferent to the violation of the plaintiffs' right to bodily privacy; and that all the DOC Defendants were grossly negligent in managing subordinates who directly and indirectly violated the plaintiffs' constitutional right to bodily privacy.

Similar issues were raised in *Braswell v. Community Solutions, Inc.*, No. 3:11–cv–01043(JCH) (D.Conn. Aug. 27, 2012) (ruling granting motions to dismiss) [hereinafter *Braswell*, Doc. No. 64]. In *Braswell*, the court set forth the following analysis, with which this court agrees:

> The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. [While the] Fourth Amendment has been interpreted to protect the reasonable bodily privacy interests of citizens, including prisoners, *see, e.g., Nicholas v. Goord*, 430 F.3d 652, 658 (2d Cir.2005), it has been so interpreted only in the context of claims that a search—physical or visual, invasive or not—has violated the plaintiff's Fourth Amendment rights. *See, e.g., id.* (holding that

> "drawing blood from inmates . . . effects a constitutionally cognizable intrusion on prisoners' expectation of privacy" and therefore "constitute[s] a *search* implicating the Fourth Amendment" (emphasis added)); *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir.2008) (holding that strip search of arrestee was unreasonable and therefore violated her Fourth Amendment rights); *Roe v. Marcotte*, 193 F.3d 72, 76–77 (2d Cir.1999) (applying Fourth Amendment analysis to claim challenging constitutionality of mandatory DNA data collection from prisoners); *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir.1992) (applying Fourth Amendment analysis to claim that visual body-cavity search violated right to bodily privacy); *see also United States v. Dionisio*, 410 U.S. 1 [93 S.Ct. 764, 35 L.Ed.2d 67] (1973) (holding that the Fourth Amendment does not protect compulsory appearance before a grand jury and compulsory voice sample recording because it was neither a seizure nor did the defendant have a reasonable expectation of privacy in the sound of his voice such that its required disclosure would constitute a search protected by the Fourth Amendment).

*Braswell*, Doc. No. 64, at 14. The plaintiffs have not alleged that Doucette or Villafane were subjected to a search, and have not explained how the Fourth Amendment might apply in the absence of a search.[4]

Therefore, Count Four is being dismissed with respect to the State Defen-

---

**4.** In their discussion of Count Four in the Plaintiffs' Memorandum of Law in Opposition to State of Connecticut Defendants' Motion to Dismiss (Doc. No. 43), the plaintiffs argue that they were "entitled to the investigation due to the seriousness of the allegations" because "[c]ase law has stated that sexual as-

saults and abuse is not something that will be tolerated. . . ." (Pls. Mem. in Opp. at 20.) The plaintiffs do not explain, and it is not apparent, how the Fourth Amendment might give rise to a right to have an investigation made into one's complaints.

dants.[5]

### E. Count Five: Assault and Battery

In Count Five, the plaintiffs assert that all the DOC Defendants are liable for assault and battery.

#### 1. Direct Liability of Lindley

In Count Five, the plaintiffs allege that "Lindley's conduct constitutes the crime of conspiracy and aiding and abetting assault as set forth in Title 53a of the Connecticut General Statutes." (Compl. ¶ 224.) While the Complaint labels Lindley's conduct as criminal and the State Defendants construe the claim as such in their motion to dismiss, the court construes this claim, which is made in a civil lawsuit, as a civil tort claim.

■■ The court can infer three bases for the plaintiffs' assault and battery claim against Lindley, each of which is based on a theory the Lindley aided Lester in sexually assaulting Doucette and Villafane. The elements for civil liability for aiding and abetting are:

(1) [T]he party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

*Efthimiou v. Smith,* 268. Conn. 499, 505, 846 A.2d 222 (2004) (quoting *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C.Cir.

1983)); *see also Master–Halco, Inc. v. Scillia, Dowling & Natarelli, LLC,* 739 F.Supp.2d 109, 121 (D.Conn.2010) ("what must be proven for aider-abettor liability is that the individual gave substantial assistance to the tortfeasor in carrying out the tort with the knowledge—or reckless indifference to the possibility—that the assistance would aid in carrying out that tort"); *Braswell,* Doc. No. 64, at 16.[6]

■ First, the plaintiffs may be claiming that Lindley aided Lester in abusing inmates by discouraging Doucette from filing a grievance against Lester. The Complaint alleges that Lindley told Doucette that he "should not start something that he could not win." However, the Complaint further alleges that, despite Lindley's comment, Doucette filed a grievance regarding sexual abuse. (Compl. ¶¶ 130–31.) Thus, Lindley's comment to Doucette, even if intended to aid Lester by discouraging reporting of abuse by Lester, is not alleged to have substantially assisted the abuse by Lester.

Second, the plaintiffs may be claiming that Lindley improperly used her authority to aid Ball and Lester in committing sexual abuse. The Complaint alleges that Lindley "threaten[ed] the inmates with prolonged imprisonment and discipline if they refused or complained about the sexually abusive, harassing, and threatening demands upon their persons by the CSI employees." (Compl. ¶ 5.) However, the plaintiffs do not allege that Lindley ever

---

**5.** Because the court dismisses Count Four on this basis, it does not reach the State Defendants' argument that, under *Poe v. Leonard,* 282 F.3d 123 (2d Cir.2002), the Fourth Amendment does not apply to the circumstances alleged in this case.

**6.** Additionally, for tort liability to be based on a theory of civil conspiracy or aiding and abetting, the plaintiffs must have a viable claim for the underlying tort. *See Macomber*

*v. Travelers Prop. & Cas. Corp.,* 277 Conn. 617, 636, 894 A.2d 240 (2006) ("to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort" (citation omitted)); *Efthimiou,* 268 Conn. at 505, 846 A.2d 222 ("before the defendants can be held liable for aiding and abetting, the plaintiff must establish" the underlying cause of action).

used her authority for such a purpose as to Doucette or Villafane. Thus, the Complaint fails to allege facts that could establish substantial assistance by Lindley based on this theory.

Third, the plaintiffs may be claiming that Lindley assisted Lester in abusing the plaintiffs by improperly handling reports of abuse. However, the Complaint does not allege that Lindley handled the complaints in a manner that would substantially assist Lester, but rather alleges that she reported complaints to superior DOC officers and to CSI management. Therefore, the plaintiffs fail to state a claim that Lindley aided and abetted assault and battery.

■ Furthermore, the plaintiffs have not stated a claim against Lindley in Count Five for civil conspiracy. The elements of a claim for civil conspiracy are:

(1) [A] combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff.

*Harp v. King,* 266 Conn. 747, 779, 835 A.2d 953 (2003) (quoting *Marshak v. Marshak,* 226 Conn. 652, 665, 628 A.2d 964 (1993)); *see also Braswell,* Doc. No. 64, at 16. The plaintiffs did not allege facts that could establish an agreement or combination between two or more persons. *See Harp v. King,* 266 Conn. at 779, 835 A.2d 953 ("the essence of a civil conspiracy" is "two or more persons acting together to achieve a shared goal that results in injury to another"); *Master–Halco, Inc. v. Scillia, Dowling & Natarelli, LLC,* 739 F.Supp.2d 104, 107 (D.Conn.2010) (under Connecticut law, "[t]he purpose of a civil conspiracy claim is to impose liability on all those who *agreed* to join the conspiracy.... To say that

individuals 'join' a conspiracy, thereby exposing them to liability, is to say that they *agree* to participate, in some manner, in the object of the conspiracy." (emphasis added)); *id.* at 107–08 ("a plaintiff must show that the agreement was the obtaining of a particular objective" (citing *Dumais v. Hartford Roman Catholic Diocese,* No. X07CV010077631S, 2002 WL 31015708, at *2 (Conn.Super.Ct. July 31, 2002))). The Complaint does not allege that Lindley entered an agreement with Lester (or anyone else) regarding abuse of the plaintiffs or other inmates, nor does it even allege that Lester or Ball were aware of Lindley's conduct. Therefore, the plaintiffs have failed to state a claim against Lindley for civil conspiracy to commit assault and battery.

### 2. *Respondeat Superior* Theory of Liability as to All DOC Defendants

■ The plaintiffs assert in Count Five that all the DOC Defendants are liable for the acts of CSI, Borjeson, Ball and Lester based on a theory of *respondeat superior.* As discussed in *Braswell,*

"[A] master is liable for the wilful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business." *Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 500 [656 A.2d 1009] (1995). The affairs of the master, and not solely the affairs of the servant, must be furthered by the objectionable conduct. *See id.* at 501 [656 A.2d 1009]; *Mitchell v. Resto,* 157 Conn. 258, 262 [253 A.2d 25] (1968). Thus, "the vital inquiry in this type of case is whether the servant on the occasion in question was engaged in a disobedient or unfaithful conducting of the master's business, or was engaged in an abandonment of the master's business." *A–G Foods,*

*Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 210 [579 A.2d 69] (1990). Unless the servant was moved at least in part by a purpose to serve the master, the master is not liable. *Id.* Ordinarily, the question of whether an intentional tort was in the scope of the agency relationship and in furtherance of the master's interests is a factual one, but ["]there are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law." *Id.* at 207 [579 A.2d 69].

*Braswell,* Doc. No. 64, at 18. Generally, "[s]exual assault by an agent is outside the scope of an agency relationship and not in furtherance of the principal's affairs." *Id.* at 18–19 (citing *Atwood v. Town of Ellington,* 427 F.Supp.2d 136, 144 (D.Conn.2006) (town constable not acting within the scope of his employment when he sexually assaulted plaintiff); *Abate v. Circuit–Wise, Inc.,* 130 F.Supp.2d 341, 347 (D.Conn.2001) (granting employer's motion to dismiss claim of assault and battery because it could not be held vicariously liable for employee's sexual assault of plaintiff); *Gutierrez v. Thorne,* 13 Conn.App. 493, 499, 537 A.2d 527 (1988) (employee of department of mental retardation not acting in the scope of his employment when he sexually assaulted plaintiff who he was assigned to supervise and the key to whose apartment he had been given by the department)).[7] In their opposition to the instant motion to dismiss, the plaintiffs argue that the alleged sexual assault by Ball and Lester falls within the scope of the State Defendants' employment because the sexual assault was intended to induce compliance with Drapelick Center policies and to further DOC goals relating to compliance with rules. (Pls. Mem. in Opp. (Doc. No. 43) at 22.) However, the Complaint fails to allege that the sexual assault was aimed at serving any purpose of the DOC. Indeed, the Complaint alleges that that "Drapelick Center inmates who acquiesced to Ball's and Lester's sexual demands received favors from Ball and Lester such as cell phones, take-out food deliveries, conjugal visits, trips to Ball's apartment in Enfield, shopping trips with Ball, access to Ball's private motor vehicle, no discipline for dirty urine samples, and pornographic movies, all of which were considered violations of program policies." (Compl. ¶ 115.) In other words, the Complaint alleges that sexual assaults were linked with breaking program rules, not calculated to induce compliance with DOC rules. Thus, the plaintiffs have not alleged facts that could establish that assault(s) committed by Ball or Lester are within any agency relationship between the State Defendants and CSI or CSI employees. Therefore, the plaintiffs have not stated a claim for assault and battery against the State Defendants based on a theory of *respondeat superior.*[8]

---

**7.** In *Braswell,* the court acknowledged that, in situations unlike the present one, "Connecticut courts have applied limited exceptions to" the general rule that sexual assault is outside the agency relationship. *Braswell,* Doc. No. 64, at 18–19 (citing *Mullen v. Horton,* 46 Conn.App. 759, 765–66, 700 A.2d 1377 (1997) (finding summary judgment inappropriate as to religious order's *respondeat superior* liability for the actions of a priest/psychologist, where the priest's sexual relationship with plaintiff began during counseling sessions because "a trier of fact could reasonably determine that Horton's sexual relationship with the plaintiff was a misguided attempt at pastoral-psychological counseling, or even an unauthorized, unethical, tortious method of pastoral counseling, but not an abandonment of church business")).

**8.** The State Defendants, who are being sued in their individual capacities, additionally argue that they had no agency relationship as individuals with CSI or CSI employees. (*See* Mem. of Law in Support of Mot. to Dismiss (Doc. No. 31) at 62.) The court does not

For these reasons, Count Five is being dismissed with respect to the State Defendants.

### F. Count Six: Negligent Hiring, Retention, and Supervision

In Count Six, the plaintiffs assert a claim that Lantz, Braren and O'Connor are liable to the plaintiffs based on a theory of negligent hiring, retention, and supervision relating to operations at the Drapelick Center. Under Connecticut law,

> [n]o state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment. Any person having a complaint for such damage. or injury shall present it as a claim against the state under the provisions of this chapter.

Conn. Gen. Stat. Ann. § 4–165(a).

State officers and employees, to whom § 4–165 applies, "include[] every person . . . employed in any office, position or post in the state government. . . ." Conn. Gen. Stat. Ann. § 4–141. The Complaint alleges that each of the State Defendants was an employee of either DOC or DPS at all times relevant to the Complaint. Therefore, they are state officers or employees as defined by § 4–141, and § 4–165 applies to them.

 The Connecticut Supreme Court has interpreted § 4–165 to mean that "state employees may not be held personally liable for their negligent actions performed within the scope of their employment." *Miller v. Egan,* 265 Conn. 301, 319, 828 A.2d 549 (2003); *see also Hamilton v. Lajoie,* 660 F.Supp.2d 261, 266 (D.Conn.2009) ("[I]f the Defendants acted wantonly, they may be held liable for

committing some other tort, but not for negligence. . . . Insofar as [the Plaintiff] contends that the Defendants acted *negligently* . . . § 4–165(a) bars recovery."). In Count Six, the Complaint alleges that Lantz, Braren and O'Connor acted negligently in contracting with CSI and supervising CSI operations at the Drapelick Center. Such conduct clearly falls within scope of their employment as DOC officials. Moreover, the Complaint asserts only that this conduct was negligent, and not that it was wanton or willful. Because Lantz, Braren and O'Connor may not be held personally liable for negligent performance of their duties on behalf of the State, Count Six fails to state a claim against the State Defendants for which relief can be granted.

Therefore, Count Six is being dismissed with respect to the State Defendants.

### G. Count Seven: Intentional Infliction of Emotional Distress

 Count Seven asserts a claim for intentional infliction of emotional distress. To state a claim for intentional infliction of emotional distress, a plaintiff must allege: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . ." *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 443, 815 A.2d 119 (2003). Conduct is extreme and outrageous if it "go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

---

reach this argument because it is granting the motion to dismiss the claim of *respondeat*

*superior* liability under Count Five on other grounds.

"Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059 (2000).

Although Count Seven is purportedly brought against all defendants, no theory of liability for intentional infliction of emotional distress is put forward as to the DPS Defendants.

### 1. Direct Liability of Lindley and Lantz

In Count Seven, the plaintiffs allege that Lindley conspired and aided and abetted assault. They further allege that Lindley's conduct in doing so "exceeded all bounds tolerated by decent society" and that "her conduct was calculated to cause, and did cause, mental distress to Plaintiffs of a very serious nature." (Compl. ¶ 244.) As discussed in section III.E.1, the plaintiffs fail to allege facts that could establish that Lindley aided, conspired to commit, or otherwise supported abuse of Doucette and Villafane. Indeed, the Complaint fails to allege any conduct by Lindley that could be considered extreme and outrageous.

 The plaintiffs further allege that Lantz intentionally inflicted emotion distress by "ignoring the needs of sexual assault victims and defaming their victimization by alluding to inmate 'con games.'" (Compl. ¶ 245.) The Complaint makes the following factual allegations regarding Lantz that are relevant to Count Seven:

- On November 23, 2007, Lantz directed Lajoie to investigate "possible undue familiarity involving staff at Drapelick Center." (Compl. ¶ 50.)
- On August 25, 2008, Lantz received an Investigation Report from that investigation.
- On March 10, 2009, Lantz recommended that O'Connor, Montesi, and a third DOC representative be empanelled to review six recommendations for DOC halfway houses and transitional facilities. The recommendations included requiring CSI to prepare a written plan and submit to audits, requiring transitional facility staff to attend training sessions "regarding inmate supervision and awareness of inmate con games", and having unannounced DOC audits of all contracted facilities. (Compl. ¶ 68.)
- In February 2009, Lantz, along with Lajoie and Braren, had represented that these recommendations had been or were in the process of being implemented.

As observed in *Braswell*, two theories of intentional infliction of emotional distress may be inferred from these facts. First, the claim may relate to the investigation into the Drapelick center, i.e., the plaintiffs may be claiming that the investigation into the Drapelick Center by Lantz was insufficient and that Lantz intended, knew, or should have known that the insufficient investigation would cause emotional distress. As noted in *Braswell*,

> Connecticut courts have been unwilling to hold defendants liable for nonfeasance or failure to intercede, even where those defendants knew that misfeasance or harm was occurring or was likely to occur. *See, e.g., Giard v. Town of Putnam*, No. CV085002754S, 2008 WL 5481273, at *10–11 (Conn.Super. Dec. 3, 2008) (finding no intentional infliction of emotional distress because there had been no "affirmative misbehavior" where defendant guidance counselor failed to stop student's suicide, despite student's announcement that he was going to kill himself); *Kilduff v. Cosential, Inc.*, 289 F.Supp.2d 12, 22 (D.Conn.2003) (dismissing intentional infliction of emotional distress claims against CEO who failed to

act in response to plaintiff's complaint detailing ongoing, serious sexual harassment by her supervisor because, whether "[c]haracterized as either a failure to respond or to prevent, or choosing to ignore, such conduct does not rise to the level of extreme and outrageous behavior") (internal quotation marks omitted); *see also Abate v. Circuit–Wise, Inc.,* 130 F.Supp.2d 341, 348 (D.Conn.2001) (holding that plaintiff had not alleged extreme and outrageous conduct because defendant's failure to prevent sexual harassment does not rise to the level of intentional, extreme and outrageous conduct that would support a claim for intentional infliction of emotional distress); *Dyson v. Colon,* No. CV106016063S, 52 Conn. L. Rptr. 613, at *3 [2011 WL 4716281] (Conn.Super. Sept. 15, 2011) ("Our Supreme Court has previously found that nonfeasance does not constitute extreme and outrageous conduct for the purposes of an intentional infliction of emotional distress claim.").

*Braswell,* Doc. No. 64, at 23–24. To the extent the plaintiffs are claiming that the investigation by Lantz was insufficient, they are attempting to make a claim of intentional infliction of emotional distress based on nonfeasance. Thus, the plaintiffs have not stated a claim against Lantz for intentional infliction of emotional distress based on this theory.

Second, the claim may relate to the six recommendations, namely that Lantz intended, knew, or should have known that (i) not addressing the needs of sexual assault victims in the recommendations or (ii) referring to "inmate con games" in the recommendations would cause severe emotional distress. The absence of recommendations addressing the needs of sexual assault victims cannot be the basis for an intentional infliction of emotional distress claim because, as discussed above, nonfeasance cannot be the basis for an intentional

infliction of emotional distress claim under Connecticut law. The reference to "awareness of inmate con games" likewise cannot be the basis for an intentional infliction of emotional distress claim because including such a point in the recommendations does not constitute extreme and outrageous conduct. *See, e.g., Carrol v. Allstate Ins. Co.,* 262 Conn. at 443, 815 A.2d 119 ("Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress.") Therefore, the plaintiffs have failed to state a claim of intentional infliction of emotional distress against Lantz.

### 2. *Respondeat Superior* Theory of Liability as to All DOC Defendants

Also in Count Seven, the plaintiffs allege that all the DOC Defendants are liable for the actions of CSI employees based on a theory of *respondeat superior.* However, for the reasons discussed in section III.E.2, the plaintiffs have not alleged facts that could establish an agency relationship between the State Defendants and CSI or CSI employees. Thus, the Complaint fails to state a claim of intentional infliction of emotional distress against the DOC Defendants based on a theory of *respondeat superior.*

Therefore, Count Seven is being dismissed with respect to the State Defendants.

### H. Count Eight: Negligent Infliction of Emotional Distress

In Count Eight, the plaintiffs claim that all the State Defendants are liable for negligent infliction of emotional distress. The plaintiffs claim that Lindley knew or should have known that her conduct in

conspiring and aiding and abetting assault involved an unreasonable risk of causing emotional distress that would harm the plaintiffs; that Lantz knew or should have known that her conduct in ignoring the needs of sexual assault victims and "defaming their victimization" involved an unreasonable risk of causing emotional distress that would harm the plaintiffs; and that all the DOC Defendants are liable for negligent infliction of emotional distress because all the DOC Defendants are liable for the conduct of CSI, Borjeson, Ball and Lester under a theory of *respondeat superior.* No theory of liability is put forward as to the DPS Defendants in Count Eight.

As discussed in section III.F, Connecticut state employees, including the State Defendants, have statutory immunity for negligent conduct performed in the course of their employment. In Count Eight, the plaintiffs allege only negligent (i.e., not wanton or willful) conduct. Moreover, the Complaint fails to allege any facts that could establish conduct by the State Defendants outside the scope of their employment. "In order to determine if a state actor's conduct is caused in the discharge of his or her duties or within the granted statutory authority, it is necessary to examine the nature of the alleged conduct and its relationship to the duties incidental to the employment." *Martin v. Brady,* 261 Conn. 372, 377, 802 A.2d 814 (2002) (holding that state police officers' alleged conduct involving a search and arrest fell within the scope of their employment because "[t]he arrest of the plaintiff was sought for legitimate government interests," "[t]here was no allegation of a misuse of governmental authority for personal gain," and there was no "allegation of the extraneous manipulation of government

authority in order to justify erroneous conduct"). Here, the Complaint does not allege that the State Defendants were motivated by any personal interest nor that they misused governmental authority for personal gain or to justify erroneous conduct. Thus, the State Defendants are immune under Conn. Gen. Stat § 4–165 with respect to the claim in Count Eight.

Therefore, the plaintiffs have failed to state a claim of negligent infliction of emotional distress upon which relief may be granted against any of the State Defendants, and Count Eight is being dismissed with respect to the State Defendants.[9]

## IV. CONCLUSION

The Motion to Dismiss (Doc. No. 31) is hereby GRANTED in part and DENIED as moot in part. The motion to dismiss is granted with respect to Counts One through Eight as to all claims by plaintiffs Gerald Doucette, Jr. and Juan Villafane against defendants Theresa C. Lantz, Randy Braren, Thomas O'Connor, Sondra Montesi, Carolynn Lindley, Michael Lajoie, Brian Zawilinski, Christine Whidden, John A. Danaher, III, and Sharon Cheeks, and there are no remaining claims as to any of those individuals. The motion to dismiss is denied as moot with respect to Counts One through Eight as to all claims by plaintiff Mark S. Williams and with respect to Count Nine.

It is so ordered.

---

9. Additionally, for the reasons discussed in section III.E.2, the plaintiffs have not alleged facts that could establish an agency relationship between the State Defendants and CSI or CSI employees. Therefore, the plaintiffs have not stated a cause of action against the DOC Defendants based on a theory of *respondeat superior.*